**COMMERCE INTERNATIONAL COMPANY, Inc.**

v.

**The UNITED STATES.**

**No. 287–55.**

United States Court of Claims.

Oct. 16, 1964.

Whitney North Seymour, New York City, for plaintiff. Simpson, Thacher & Bartlett, William J. Manning and Roy L. Reardon, New York City, of counsel.

Frances L. Nunn, Washington, D. C., with whom was Asst. Atty. Gen., John W. Douglas, for defendant. Kendall M. Barnes, Washington, D. C., was on the brief.

Before JONES and WHITAKER, Senior Judges, and LARAMORE, DURFEE and DAVIS, Judges.

DAVIS, Judge.

 This is a breach-of-contract suit. charging defendant with unreasonable delay in supplying parts and drawings, and in failing to permit the prompt commercial purchase of parts when none were available in Government stores. Plaintiff is said to have suffered over $1,650,-000 in damages because of defendant's improper delay.[1]

In 1950, the Army prepared to let a contract for the rebuilding of some 500 M36 90mm. motor gun carriages (tanks) which were believed needed to meet the emergency of the Korean hostilities. The vehicles were in a poor state, having been left in the open since World War II. Plaintiff had had some previous experience in rebuilding tanks and was one of five companies asked to submit bids. As plaintiff's representative, Mr. Ambrose Cates (who had been in charge of the earlier "rebuild" operations) spent two weeks at Rock Island Arsenal, in Illinois, inspecting some of the M36 tanks located there, meeting with Army representatives, and familiarizing himself with the work in order to prepare a bid; the contract specifications were not yet completed. Agents of the other companies did the same. Four concerns submitted bids on November 30, 1950, and plaintiff

---

[1]. Plaintiff's obligations under the contract were actually performed by a joint venture known as C.A.M. Industries, but plaintiff remained the only responsible contracting party. See findings 5–8. We shall therefore refer only to plaintiff. Defendant maintains that since plaintiff, as one of the joint venturers, bore only 50% of the claimed losses, it may recover no more than one-half of the total damages (if any) found to have been caused by the Government. We think that there is no such restriction. Defendant has not alleged that it is, or may be, liable to the other joint venturers nor has it sought to join them in this suit. So far as we know, there is no possibility of more than one complete recovery or of multiple suits, and since plaintiff was the sole responsible contracting party with which the Government dealt we think it entitled to full recovery should we find for it. Cf. United States v. Blair, 321 U.S. 730, 737–738, 64 S.Ct. 820, 88 L.Ed. 1039 (1944). The situation here is unlike that in which a prime contractor sues on behalf of a subcontractor to which the prime is not liable. Cf. J. L. Simmons Co. v. United States, 304 F.2d 886, 158 Ct.Cl. 393 (1962).

was found to be the low bidder. A pre-award survey was made, by Army officials accompanied by Cates, of the facilities at Cramp Shipyard (at Philadelphia) which plaintiff had an option to sublease and where it proposed to perform. The report made to the Government confirmed the suitability of the premises for conducting the "rebuild" operation and plaintiff received a notice of award dated December 28, 1950. The contract was not formally executed until sometime in March 1951.

Although the specifications had still not been fully readied at the time of the award, the notice directed plaintiff to proceed with the work "in order that the delivery schedule outlined in your proposal may be strictly maintained." The contract called for the rebuilding of 581 M36 tanks to be delivered by the contractor to the Government in accordance with the following schedule: [2]

| | |
|---|---|
| April 1951 | 75 |
| May 1951 | 100 |
| June 1951 | 100 |
| July 1951 | 125 |
| August 1951 | 125 |
| September 1951 | 56 |

Among other things, the Government was to supply reconditioned engines and 90mm. guns for all of the tanks. In addition, at the contractor's written request, the Government was to furnish, "to the extent available from its existing stores," parts and materials "which have been declared unserviceable by the Contracting Officer or which after inspection were found to be missing from the vehicles." If such replacement items could not be furnished, the contractor, when directed by the Contracting Officer in writing, was to manufacture or purchase the parts and would be reimbursed its actual costs in an aggregate not exceeding $500,000.[3] There was also the normal clause permitting extensions of time if the Government's failure to supply parts and materials caused delay in the work.

At the outset of performance, in early January 1951, plaintiff had basically to start from scratch in organizing an operational physical plant and production line. It had a nucleus of only three men (management or administrative personnel) in Philadelphia and had yet to hire a full complement of administrative and production employees. It also had to exercise its option on the Cramp Shipyard facilities and to prepare the premises for receiving and storing tanks, parts, and equipment. All of this plaintiff says was accomplished in time to complete the rebuilding on schedule were it not for government-caused delays. Completion, originally set for September 1951, did not come until September 1952.[4] From December 28, 1950 (notice of award) to December 15, 1951,[5] plaintiff finished the rebuilding of 261 tanks; then, because the Government could not for a time supply further engines and guns, the work was suspended until March 15, 1952; operations resumed thereafter and were continued in an orderly and prompt fashion. This history of performance is divided by the parties into three periods. The "first phase" was from January 1951 until suspension; then came the "suspension period" (from December 15, 1951, until March 15, 1952); finally, there was the "second phase" from March 15, 1952, until completion in September 1952. Plaintiff makes no claim for delay (or other damages) during the second phase (except that which may have been an after-effect of the three-month suspension from December 15, 1961, to

2. This schedule was revised several times to extend the time of performance. By supplemental agreement the number of tanks was also increased. There were 12 supplemental agreements which are described in finding 3.

3. A contract amendment later increased this amount substantially when it was found to be insufficient.

4. The Government made no claim for liquidated damages.

5. Defendant disputes this date and says that the 261 tanks were not fully readied until a later time. The December 15th date, found by our Trial Commissioner, is well supported and we accept it.

March 15, 1952). Defendant, on its part, does not contest liability for damages during the suspension period. The main battleground is the first phase, during which plaintiff claims, and defendant denies, that undue Government delay caused the considerable loss which the contractor incurred on this contract.

 This claim has not been administratively considered on its merits. Although plaintiff did apply to the Contracting Officer for compensation, the claim was denied without any consideration on the ground that it was outside agency jurisdiction as a demand for unliquidated damages. Plaintiff's petition was then filed in this court, the case tried, the Trial Commissioner's findings reported, and the briefs and exceptions filed, without any objection by the defendant to the trial and determination of the case in this court and without any suggestion of the need for administrative proceedings. After the filing of the Commissioner's report and of all the exceptions and briefs, but before the oral argument, the defendant for the first time moved for a stay to permit the parties to have the issues determined administratively, citing United States v. Carlo Bianchi & Co., 373 U.S. 709, 83 S.Ct. 1409, 10 L.Ed.2d 652 (1963). Plaintiff opposed the motion and it was denied (before argument) without prejudice. The point was again raised at the argument. We reject it. Whatever might have been the defendant's right to seek administrative determination of the facts if the issue had been timely raised, we hold, as we have before, that in this case defendant waived any such right by making its first move too late. WPC Enterprises Inc. v. United States, Ct.Cl., 323 F.2d 874, 878, decided Oct. 11, 1963; Stein Bros. Mfg. Co. v. United States, Ct.Cl., 337 F.2d 861, 862–863, decided July 12, 1963; Wingate Construction Co. v. United States, Ct.Cl., No. 394–60, decided Jan. 24, 1964, slip op., p. 7.

 As the case comes to us, the overriding issue is whether defendant should be held responsible for expenses said to have been caused plaintiff by the alleged failure of the Government, during the first phase of performance (December 28, 1950–December 15, 1951), to be reasonably prompt in (i) furnishing parts available from Government stores, (ii) making known its inability to supply such parts so that plaintiff could procure them elsewhere, (iii) furnishing drawings necessary for such outside procurement of parts, and (iv) facilitating such outside procurement. It is settled, of course, that *mere* delay, *per se,* incident to the Government's making work or material available to a contractor is not compensable, in a claim for breach of contract, without a specific warranty. E. g., United States v. Howard P. Foley Co., 329 U.S. 64, 67 S.Ct. 154, 91 L.Ed. 44 (1946); United States v. Rice, 317 U.S. 61, 63 S.Ct. 120, 87 L.Ed. 53 (1942); Gilbane Building Co. v. United States, Ct.Cl., 333 F.2d 867, decided June 12, 1964; Barling v. United States, 111 F.Supp. 878, 126 Ct.Cl. 34 (1953); Otis Williams & Co. v. United States, 120 Ct.Cl. 249 (1951); Daum v. United States, 120 Ct. Cl. 192 (1951). Absent a warranty (and there is none in this case), the contractor's recourse for mere delay is to seek an extension of the time of his performance. See, e. g., United States v. Howard P. Foley Co., supra. But this general principle presupposes that the Government has met the ever-present obligation of any contracting party to carry out its bargain reasonably and in good faith. See, e. g., Walsh v. United States, 102 F. Supp. 589, 121 Ct.Cl. 546 (1952). Unless expressly negatived, that duty is read into all bargains. It would be intolerable if the Government could disregard that responsibility, or were free to stretch its tardiness for however long it fancied, without sterner control than the mere prolongation of the completion date of the contract. The rule is, rather, that, when the Government's delay in furnishing work or materials stems from its failure to do what it should under the particular contract, it will have to respond in damages for the resulting additional outlays which are proved to have been caused the contractor. E. g., Peter Kiewit Sons' Co.

v. United States, 151 F.Supp. 726, 138 Ct.Cl. 668 (1957); Thompson v. United States, 124 F.Supp. 645, 130 Ct.Cl. 1 (1954); Chalender v. United States, 119 F.Supp. 186, 127 Ct.Cl. 557 (1954); Kehm Corp. v. United States, 93 F.Supp. 620, 119 Ct.Cl. 454 (1950); Laburnum Construction Corp. v. United States, Ct. Cl., 325 F.2d 451, 458, decided Dec. 13, 1963. Under this principle, the plaintiff cannot prevail merely by proving that there was a lapse of time in receiving materials or even that the defendant was the source of that lapse. The lapse of time must be tied to the defendant's breach of its obligation of reasonable cooperation. The nature and scope of that responsibility is to be gathered from the particular contract, its context, and its surrounding circumstances. Once a breach of this type has been established, the contractor must still show, as in all contract cases, that damage ensued. Cf. Litchfield Mfg. Corp. v. United States, Ct.Cl., 338 F.2d 94, decided this day.

█ The net of our Trial Commissioner's report is that plaintiff's evidence has not met this standard. He has found, in effect, that the contractor has not borne its burden of proving that (a) the defendant delayed *unduly* with respect to the furnishing of parts from Army stores, (b) any delays of this type interfered with plaintiff's production, particularly in view of other concurrent causes of delay for which defendant was not responsible (plaintiff's own production difficulties and inadequacies; delay by subcontractors; difficulties with plaintiff's private landlord), and (c) the failure of defendant to supply drawings adversely affected plaintiff's purchase of those parts not supplied by the Government. These are all factual questions which have been fully tried; the Commissioner's adverse findings are therefore presumptively correct. Plaintiff has the twin task of affirmatively showing us that the Commissioner is wrong and that it has shouldered its own burden of proof as the suing contractor. "In this, as in all cases in which a Commissioner has carefully weighed conflicting evidence, the burden of sustaining exceptions to the findings is far from slight. We start with the double directive that due regard must be given to the Commissioner's opportunity to judge the credibility of the witnesses and that his factual findings 'will be presumed to be correct.' Rule 48 [now Rule 66]. That presumption is dissipated only by a strong affirmative showing. Where, as often happens, what appears to be a sound objection to a finding is answered by an equally sound explanation in support of it, the presumption will carry the day. Where the specific testimony of witnesses, believed by the trier-of-fact, is countered only by the advocate's theoretical arguments which may or may not be correct, we must ordinarily accept the trier's evaluation. The same is true where the Commissioner has preferred one witness to an event (or set of witnesses) over another. Stronger assaults must be launched before the recommended findings can be overthrown. This is not to abdicate the court's function as the ultimate finder of the facts. In a fallible and busy world, all that can be required for the due administration of justice and the foundation of a judgment is that, *when the balance is close*, we rely on the appraisal of an unprejudiced trier who has followed a process which will generally bring about a correct determination." Davis v. United States, Ct.Cl., No. 179–59, decided Feb. 14, 1964, slip op., pp. 4–5 (emphasis added).

A. *Parts from Government Stores.*— The contract did not spell out a schedule for the delivery of tank parts by the defendant. These replacement items were to be provided as needed, but only to the extent available in Government stores. There was no guarantee or representation as to the number or type of parts which the Government would or could supply. The contractor first determined the items it wished to requisition; the contracting officer had to accept and countersign the requisition form; the papers were then forwarded to an Army depot to determine whether the requested items were available and where they were located.

To the extent that the parts were available they were ordered, packaged, and shipped to plaintiff. To the extent the items were not available the plaintiff was informed that its request had been denied; only then was it free to obtain the part through purchase or manufacture.

Plaintiff's claim, with respect to the government-furnished parts, is that there was undue and damaging delay both in delivering items that were eventually supplied by the Government and also in telling plaintiff when requested items were not available in Army stores. To sustain this aspect of its case plaintiff now relies largely on (a) alleged admissions by defendant's officials that undue Government delay was hindering plaintiff's performance; (b) a series of complaints by plaintiff, said to be to that effect; and (c) an accountants' tabulation showing the number of days elapsing between the date of the contractor's requisition and notification by the defendant that the request was denied (in whole or part), as well as the periods between requisition and receipt of parts from Government sources. In the light of the whole record, however, these pieces of evidence (and the others which plaintiff collects) do not move us to reject the Trial Commissioner's conclusion that plaintiff has failed to show that any such delays were undue or caused damage. There undoubtedly were elapsed periods which now seem quite extended, but plaintiff has not proved that these delays breached the Government's implicit obligations under the contract or that the delays actually hobbled performance.

1. *Undue delay.* It was inherent in the requisitioning system which plaintiff accepted (and which it knew before the formal execution of the contract in March 1951) that there were many possibilities of delay in the ordinary course of events. There were several steps in the process, several Army installations had to be canvassed at one time or another, and several lists consulted. The defendant's stores were not all centralized and easily available. Moreover, at two pre-award conferences plaintiff was informed by the commanding officer of Rock Island Arsenal that spare parts in Government stores were "not plentiful," that they were "scarce," due to the defense effort.[6] Because of this dearth of parts, it was agreed that plaintiff was not to order them all at once in maximum quantities. Plaintiff was thus forewarned at the outset of possible shortages, and also of possible delays in receiving parts (or notices that its requests would be denied). It had no right to anticipate as accurate and prompt service as might be expected under other conditions. The Government's obligation is measured not by an ideal standard of promptness unrelated to the specific situation, but by the reasonable expectations of the parties in the special circumstances in which they contracted. Here, some delays should have been contemplated; the defendant would not default on its responsibility merely because the requisitioning process took longer than was initially hoped. Something more would have to be shown.

On this view, it is not significantly helpful to plaintiff that the original schedule for the contract was changed, so as to prolong plaintiff's time, because of delays in receiving parts (and drawings). In the circumstances, these extensions could well mean that the parties' hopes had outrun reality, rather than that the defendant had acted improperly. Recognizing the delays as the cause of the extensions would free the plaintiff of the threat of liquidated damages, but it would not, in itself, prove that the delay was wrongful. Cf. Robert E. Lee & Co. v. United States, Ct.Cl., No. 252–60, decided Jan. 24, 1964, slip op., pp. 3–5. The same is true of the "admissions" which plaintiff cites. The defend-

---

6. Plaintiff maintains that it was not told of the scarcity of parts prior to the award, but there is significant testimony in the record which supports the Commissioner's contrary findings. The issue is one of credibility, particularly within the competence of the Commissioner who heard and observed the witnesses.

ant's officers conceded that there were shortages of parts and delays for which plaintiff was not responsible, but they did not say that the Government had acted improperly or negligently. Their statements are all consistent with the implicit view that the delays were inherent in the process and in the circumstances—though in fact not foreseen by the parties.

Plaintiff's own written "complaints" during the first phase are hardly more persuasive as proof overturning the Commissioner's findings. The major purpose seems to have been to obtain time-extensions and avoid liquidated damages. The statements about failure to obtain *drawings* are clearly directed at the defendant, but the references to parts are much more muted. Not until October 1951, toward the last of the first phase, do these documents really suggest that the defendant, rather than the situation, was at fault with respect to the parts. Until then, the responsibility appears largely centered, even in plaintiff's eyes, in the inherent situation; for instance, in August 1951, a letter from plaintiff recognizes that "it takes considerable time before the Government is able to render a decision as to whether they can supply the parts as Government Free Issue under their depots or whether the contractor is authorized to purchase from the market under Part II of the contract." The record does not convince us that even the plaintiff felt, prior to the latter part of the first phase, that though there was delay which could be shortened the defendant was breaching any obligation as to the parts.[7]

Plaintiff's major assault on the Commissioner's findings utilizes an accountants' survey of the time which elapsed between the requisitions and either the delivery of the parts or the notice of unavailability. This tabulation shows that, for most of the filled requisitions, at least 30 days elapsed before delivery; on fewer occasions the time was 60 days or more; and for a substantial number the period was 90 days or more. As for the unfilled requests, although in the vast majority of instances notice was given in less than 30 days, there were 846 occasions on which 30 days or more elapsed; on 151 occasions this process took 60 days or more, and on 87 occasions 90 days or more. The Commissioner obviously gave little weight to this survey, and we do not feel justified in overruling him. The most telling defects are in the survey's failure to link the delays (assuming that they were wrongful) to plaintiff's performance (a subject we discuss immediately below), but we note also that the survey does not even compel the conclusion that the defendant took unreasonably long, in the circumstances, in filling or passing upon the requisitions. Defendant's elaborate analysis in its brief (which we do not stop to summarize) points out various ways in which the survey falls short of proving that essential point. Though defendant's analysis may not be wholly correct, we cannot say that the accountants' tabulation has the impact plaintiff attributes to it. On the other hand, the record adequately supports the Commissioner's affirmative finding that "extensive and continuous efforts were made by Government representatives to assist plaintiff in expediting procurement of parts from Government stores or in rapidly approving plaintiff's requests to purchase parts from commercial sources or for deviations."[8] The result is that we cannot say

7. Plaintiff points out that it was forced to cannibalize other tanks in order to find parts for the tanks on which it worked during the first phase. This resort to cannibalization proves nothing more than the admitted existence of shortages; it does not show that the shortages were caused by defendant's fault or undue delay.

8. Almost immediately after the notice of award, during the first week in January 1951, an experienced property and supply clerk was assigned by the Army to assist in expediting the initial requisitions. This employee helped plaintiff in filling out the forms which were then carried by hand to the Philadelphia Ordnance District where they were signed by an Army Major and returned im-

that plaintiff has borne its burden of proving that the Government delayed unduly with respect to the parts.

█ 2. *Causation.* Similarly plaintiff has not persuaded us that the Commissioner was wrong in his alternative conclusion that any undue delays on defendant's part (with respect to the parts) have not been shown to have interfered with production. Plaintiff must admit that, no matter how unreasonable the Government's delay, there can be no recovery without proof that that delay caused material damage. Cf. Robert E. Lee & Co. v. United States, supra, Ct.Cl., No. 252–60, decided Jan. 24, 1964; Ralph Feffer & Sons v. United States, Ct.Cl., Cong. No. 5–60, decided June 12, 1964, slip op., p. 8. In the evidentiary record made in this case there is much to support the Commissioner's determination that such proof has not been made.

█ The primary lack is plaintiff's complete failure to link its accountants' general survey of the amounts of time taken by the Government (in the requisitioning process) with the course of the plaintiff's operations. We are reminded in general terms that for want of a nail a kingdom could be lost, but there is no evidence or attempt to show, even by illustration, that the delay on this-or-that part held up work on so many tanks for

such-and-such an approximate period. We are not told what inventories plaintiff had at various times, what parts it needed from time to time, or when it needed them. There is no effort to differentiate, even by general classes, between the reasonable and the unreasonable Government delays, and to show the special effect of the unreasonable delays. Other important causes of delay (such as dilatory subcontractors) are ignored. The whole subject is left to the general inference that long delays with respect to some parts *must* have caused damage. Without any specific proof, we are asked to assume that plaintiff's serious production difficulties through part shortages were all due to *undue* Government delays—even though other substantial causes for these difficulties have been advanced, much of the defendant's delay cannot on any view be deemed unreasonable, and there could not have been any injurious delay-effect with respect to the large number of plaintiff's requests (for parts) which were unnecessary.[9] Plaintiff has contended itself with broad generalities when specificity is essential.[10]

█ The case suffers from more than the absence of specific proof of causation. There is an affirmative showing that other causes, for which the defendant was

---

mediately by hand to plaintiff's representative. The requisitions were then mailed or carried to the Rock Island Arsenal for action. The first nine requisitions followed this procedure; then the property and supply officer was authorized to sign the papers in plaintiff's offices without the necessity of going to the Philadelphia Ordnance District. There were also other improvements. Plaintiff says that one of the factors adding to delays was the transfer of Rock Island Arsenal's control and supervision of the contract to the Industrial Division on April 18, 1951, and its subsequent administration by Ordnance Tank & Automotive Center (OTAC). We think, however, that the record shows that the introduction of OTAC was intended to be an improvement and there is no satisfactory proof that requisitioning took a longer time after OTAC came into the picture.

9. Some eight carloads of furnished parts were returned to defendant at the completion of the work.

10. Plaintiff's justification for its failure to offer any specific proof that undue delays by the defendant resulted in delayed production is that, at the time of the events, it was engaged in performing its contract, not preparing for litigation by keeping a detailed tab on the defendant. But plaintiff now insists that, early in performance, it began to be damaged by the defendant's undue delays, and it would not have been hard or unusual to keep records (at least illustrative or selective records) of missing parts which were holding up work on the tanks. From plaintiff's viewpoint, it is surprising that no such records were maintained since plaintiff says that it began very early to consider the defendant at fault.

not responsible, contributed most materially to the delay in production. Plaintiff has not separated these delays from that charged to the defendant, and, on this record, the Commissioner has been unable to do so. Since, as we will show, we cannot say that he was wrong, we must apply the rule that there can be no recovery where the defendant's delay is concurrent or intertwined with other delays.[11]

Plaintiff's own manufacturing problems engendered one main branch of this concurrent or inseparable delay. Plaintiff had to organize and equip an entire plant and production line, starting with three administrative employees. The building in which production was to be carried on was full of bags of grain and stores and many large items making up a disassembled steel mill. Although 70,000 square feet of the building were to be used for production, only 59,008 square feet were cleared by stages from January 1, 1951, to July 25, 1951. During January 1951 only 16,500 square feet were cleared and much of the space was used for parts which were already arriving.[12] Plaintiff's private landlord hindered it by withholding storage space which prevented the proper and orderly storing of government-furnished and commercially-obtained parts. The lack of adequate storage space had the adverse effects of hampering the formation of an efficient production line and a workable stock control system. The landlord did further damage to the orderly progress of the work by cutting off utilities and the use of cranes, and failing to make tools and equipment available throughout the nearly one-year period prior to suspension. There was also much to be desired of plaintiff's personnel, as well as a continual turnover of the supervisory staff. In the first months of the contract plaintiff's people, including its most valuable employee at the time, Mr. Cates (field manager), were partially involved in "performing or attempting to secure work outside the M36 rebuild." Finding 30. The Trial Commissioner has also found that "from the outset plaintiff's rebuild operation was characterized by lack of coordination and planning, which continued throughout the first phase of the work until the early months of 1952." Finding 29. "The confusion and inefficiency which characterized the first phase of plaintiff's operation was in large measure compounded by and due to inadequate, inexperienced personnel, particularly at the foreman, supervisory and executive level." Finding 45.[13] For a

---

11. Vogt Bros. Mfg. Co. v. United States, Ct.Cl., No. 372–56, decided Feb. 6, 1963, slip op., p. 22; Marshall v. United States, 164 F.Supp. 221, 224, 143 Ct.Cl. 51, 56 (1958); Hargrave v. United States, 130 F.Supp. 598, 602, 132 Ct.Cl. 73, 81 (1955); George J. Grant Constr. Co. v. United States, 109 F.Supp. 245, 246, 124 Ct.Cl. 202, 205–206 (1953); Tuller Constr. Co. v. United States, 118 Ct.Cl. 509, 526 (1951); Coath & Goss, Inc. v. United States, 101 Ct.Cl. 702, 714–715 (1944); Newport News Shipbuilding & Dry Dock Co. v. United States, 79 Ct.Cl. 25, 37, 40–42, 46 (1934); Greenfield Tap & Die Corp. v. United States, 68 Ct.Cl. 61, 76–77 (1929), cert. denied, 281 U.S. 737, 50 S.Ct. 333, 74 L.Ed. 1152 (and cases cited).

12. Plaintiff admits its early difficulties by not seeking any damages for the period before March 15, 1951, but it does not recognize that the earlier difficulties continued to have their effects.

13. Production seems to have been impaired by: (1) conflicting orders to the production line; (2) shifting of authority and turnover of department heads; (3) inadequately skilled production workers; (4) lack of control of the work force; (5) difficulty with labor unions, as well as strikes against other tenants of Cramp Shipyard which interfered with plaintiff's operations. Plaintiff dismisses the internal memoranda and records revealing these difficulties as "wastebasket" memoranda evoked by normal production problems which were quickly remedied. But the nature of the references in the papers to these difficulties supports the view that they were recurrent and significant problems. Plaintiff points out that the defendant did not threaten to terminate the contract for default or contemporaneously criticize the performance. These two factors deserve little weight in evaluating the Commissioner's finding. The defendant may have felt that it would be burdensome to take the contract from

significant period, the contractor's production department was apparently understaffed and under-equipped. In March 1951, there were only 57 linemen in that department. On June 20, 1951, a memorandum from the production superintendent to Mr. Cates showed that the problem still persisted:

"Along with the complete costs, you requested we submit all complaints and hold-ups on the line, which is as as follows:

"We are in need of approximately 125 men on the production line. We still need air tools, a 200 ton hydraulic press, and a couple lathes, welding machines, and one (1) more overhead crane.

"I have no excuse for 'no production', and I submit no complaints about the other Department Heads, as you will probably receive plenty in the reports turned in from other people."

A second major branch of this concurrent and inseparable delay was due to the failure of plaintiff's subcontractors to perform as expected or to make delivery until paid. Since a great portion of the necessary parts had to be obtained from subcontractors, this delay was at least as significant as that incurred on the government-furnished items. Failure to obtain a subcontractor-furnished part when needed would upset production just as much as the absence of an item from Army stores. This was made clear, at the time, by plaintiff's agents who told the Army, repeatedly, that delays by subcontractors were seriously interfering with production. In this court plaintiff has not proved, or made an effort to prove specifically, that these undoubted subcontractor delays had little or no effect on performance. On the other side, while the record does not show precisely how or how much this trouble with subcon-

tractors hampered production, the plain inference is that there was a substantial concurrent delay. This inference suffices, together with the proof of the other difficulties, to counterbalance the general inference of Government-caused delay drawn by plaintiff.

On this issue of the Government's delay with respect to furnished parts, the heart of this case, as with some previous cases, is that, in effect, plaintiff "tell[s] us only the completion date as computed under the original contract, and the date of final acceptance. In this state of the evidence, we cannot determine as a fact that the work was wrongfully delayed by the Government, and if we could so determine, we would still not have the remotest notion of how much it was so delayed." George J. Grant Constr. Co. v. United States, supra, 109 F.Supp. at 246, 124 Ct.Cl. at 205–206.

B. *Drawings and Private Procurement.*—1. From the beginning it was recognized that, for the private procurement of parts not supplied by the Government, the plaintiff might well need detailed drawings of the various items. At the pre-award conferences plaintiff was told that it would be given the drawings necessary for commercial procurement of parts peculiar to the M36 tank, but not the drawings for all of the ordinary hardware. It was later agreed that a list of drawings was to be supplied, out of which plaintiff was to choose only those actually needed for private procurement. There was some weeks' delay in declassifying drawings. On March 19, 1951, 3,426 drawings were requested and between April 2 and May 9, 1951, 3,376 drawings were received (including some not requested). Plaintiff charges this as inordinate delay.

We agree that defendant should have acted with greater speed, but the real question is whether plaintiff was dam-

plaintiff and relet it; perhaps it thought a bad bargain better than none; it may have revised its notion of the pressing need for the tanks and awaited plaintiff's delayed performance with equanimity; and the contracting officials may even

have recognized that much of plaintiff's difficulty stemmed from the outside, such as the acts of its landlord and subcontractors or the inherent delays of obtaining government furnished items.

aged. The Trial Commissioner has stated: "Although the plaintiff has demonstrated that it requested drawings of the defendant, there is no satisfactory evidence that the failure to furnish any particular drawing had any effect upon the performance of the contract work. The evidence is clear that the drawings were needed in the case where the plaintiff had to order a special part manufactured by a subcontractor. In no instance has the plaintiff shown that the ordering of any part was delayed due to lack of a drawing." Finding 47. See, also, finding 69.[14] There is no reason why plaintiff, if it were unreasonably delayed in procurement, should not have informed the court which subcontracts or purchases had to be postponed because of the absence of particular drawings— or at least have offered typical examples. That is not an undue burden to put on a claimant; the circumstances relating to a contractor's letting of subcontracts are usually well known and most often documented.

In addition, there are the same defects as to proof of causation which we have found with respect to the government-furnished parts. There is no showing that failure to receive any privately-procured part—which had been delayed because of lack of drawings—held up work on any tank. On the other hand, there are the same concurrent delays which cannot be attributed to the defendant.

2. It is argued that the $500,000 limitation on reimbursement for purchase, manufacture, and extraordinary reclamation of parts led plaintiff to believe that all but $500,000 worth of parts would be available from Army stores and, accordingly, that when there had to be a greater degree of commercial procurement (evidenced by the fact that the figure was increased by $1,000,000) plaintiff was improperly delayed. We interpret this dollar limitation not as an implicit representation of the parts to be found in Government stores (which defendant, before the award, characterized as scarce), but rather as a tentative limitation designed to caution the contractor and protect the Government from having to pay for unnecessary purchases. Contrast Myers v. United States, 120 Ct.Cl. 126, 137 (1951), where the contract clearly and affirmatively stated that the Government had requisitioned a certain amount of lumber to be supplied to the contractor. The clause in the present case was a provisional ceiling designed to restrict costs, but subject to reappraisal. The Government had no accurate way of knowing what parts would be necessary, or what parts it would have on hand when requested. No mortality table had been made for the M36, and there was no good measure of the life of all its component parts. This the plaintiff knew. The contract itself explicitly stated that the Government would only furnish parts and materials "to the extent available from its existing stores."

3. Plaintiff also claims it was delayed in commercial procurement by defendant's requirement that three bids be obtained before subcontracting. Since it was the Government's funds which were being used in procurement we think this was a reasonable demand to safeguard the public. Competitive bidding is the traditional means of doing so. The defendant had a right to require this for all purchases. The fact that plaintiff was later permitted to make small purchases of $250 without obtaining bids does not show that the three-bid requirement was unreasonable or that this new method of procurement for small purchases should have been allowed at an earlier time than was the case.

c. *Guns and Engines.*—Reconditioned engines and guns were to be supplied by defendant for all the vehicles. Sufficiently early, 581 engines were delivered to plaintiff; however, because of defendant's overseas requirements 313 were repossessed by the Government, leaving the

14. "Satisfactory proof is not shown that the purchase of parts by the plaintiff was adversely affected by the failure to have drawings available."

contractor with 268 for the first phase (the one-year span preceding suspension) with which we are now treating. Since there was an adequate number of engines to complete the 261 tanks which were rebuilt before suspension there is no ground for a claim of delay because of the absence of engines during that period.

The 90mm. guns were to be reconditioned by the Rock Island Arsenal and delivered to plaintiff in accordance with a schedule which defendant did not meet. As of August 13, 1951, plaintiff had received only 94 guns. On September 25, 1951, the contractor was advised to keep the rebuilding operation going even when the gun supply was exhausted, and that, if necessary, the tanks would be accepted without guns. Supplemental Agreement No. 2 reduced the contract price to account for elimination of the work of installing the guns; later, by Agreement No. 8, this amount was restored when, after the suspension period, guns became available and the installation was accomplished.

In a letter to the Army dated August 24, 1951 (plaintiff says one of several letters), plaintiff wrote that its inventory of guns would be entirely depleted by August 29, 1951. Although there is no such proof, we assume the latter date to be the actual point when the contractor was entirely without guns. Permission to proceed without the weapons did not come until September 25, 1951. One claim is that this interim between exhaustion-of-supply and permission-to-continue caused plaintiff damaging delay. There is, however, no evidence that work was curtailed during that period, or in what respects and to what extent. Plaintiff has shown no particular additional costs nor how much they were, nor the period of alleged delay. Installation of guns was a separate aspect of the contract; other work could apparently proceed unhindered without the weapons. On this record we have no reason to believe that the absence of guns or the delay in permission hampered the rebuilding operation—especially in the light of the concurrent delays for which defendant is not liable.

For these reasons, we conclude that plaintiff has failed to show that the Trial Commissioner erred in his basic findings relating to the first phase of contract performance. Those findings must stand and they preclude recovery for delays during that time.[15]

There remains the matter of the suspension period. The Government ordered a suspension of work after the completion of the 261st vehicle [16] because of the lack of guns and engines. Liability is admitted for the delay during this suspension and defendant agrees that the case should, on this point, be remanded to the Commissioner for a determination of damages. Although challenged by defendant, we adopt the Commissioner's determination that the work stoppage extended from December 15, 1951 to March 15, 1952 (see footnote 5, supra). We also hold that the damages should cover all the extra costs attributable to or arising out of the suspension—not merely the extra costs incurred *during* the suspension—including, for example, the additional costs (if any) of stopping the work for this suspension and then re-starting it after three months. Plaintiff is entitled to recover the damage it suffered by reason of the suspension (with deductions for whatever productive work is found to have been performed during that period) as well as any additional costs following the suspension which would not have been incurred but for the work-stoppage.

Plaintiff is not entitled to recover on its claim pertaining to the first phase of the contract (from December 28, 1950,

15. Plaintiff, suing for breach of contract, has made no claim of recovery based on a mutual mistake of fact. In any event —and assuming a mutual mistake did exist—such a claim would be barred by the plaintiff's failure to prove that its loss was due to that mutual mistake.

16. Originally the 270th vehicle, but that was subsequently reduced to the smaller number.

to December 15, 1951), and the petition is dismissed to the extent of that claim. On the remaining issue, judgment is entered for plaintiff and the case is referred to the Trial Commissioner for further proceedings, under Rule 47(c), consistent with this opinion.