**CONNOLLY-PACIFIC COMPANY and T. E. Connolly, Inc.**

v.

**The UNITED STATES.**

No. 349-61.

United States Court of Claims.

Decided April 15, 1966.

John G. Clock, Long Beach, Cal., for plaintiffs.

Thomas J. Lydon, Washington, D. C., with whom was Asst. Atty. Gen., John W. Douglas, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS and COLLINS, Judges.

the counterclaims until Congress had had the opportunity to consider and pass upon this court's opinion and findings.

DURFEE, Judge.

This is a suit by plaintiffs, a joint venture, to recover delay damages under two separate causes of action arising out of a contract which plaintiffs had with the Department of the Navy for the renovation and reconstruction of Pier and Dry Dock No. 1 at the Long Beach Naval Shipyard, Long Beach, California. The case has been submitted to the court without oral argument.

Plaintiffs, corporations engaged in the general construction business, were awarded the contract on March 21, 1957 in the sum of $3,877,711.00. The purpose of the contract was to overcome the effect of past subsidence (i. e., sinking of the ground) and to provide for future subsidence by elevating the entire dock structure around Dry Dock No. 1. The dry dock was constructed in the shape of an elongated horseshoe, its position in the shipyard lying north and south with the south end seaward. The contract called for the removal of the existing dike wall around the dry dock, and the construction of a new dock structure atop the old dock structure, such as to raise the height of the dry dock walls by the height of the new structure. The contract also called for the construction of a parapet wall,—a small section of wall about four feet in height—rising from the top of the inner wall of the new dock structure. The contract contained the standard changes, changed conditions, and disputes clauses. The original completion date was to be November 18, 1958. During performance, the contract was modified by 62 change orders under which plaintiffs' time for performance was extended 517 days to April 19, 1960, and the contract price increased to $7,050,626.31. Plaintiffs' men and equipment completed all work on the contract by early December, 1959; therefore, the extension of time granted by the change orders for the period subsequent thereto of some 120 days was unnecessary insofar as plaintiffs' own men and equipment were concerned. However, subcontractors were performing very minor work until mid-April, 1960.

Plaintiffs allege in their two causes of action in the present suit that certain activities of defendant caused plaintiffs unreasonable delay in completion of the contract, with resulting damages. In order to treat these matters chronologically, this opinion will deal with the second cause of action, and then the first cause of action.

### Second Cause of Action

This claim is concerned with the installation of concrete piles along the east side of the dry dock. The applicable specifications provided that the piles should consist of a 16-inch minimum outside diameter reinforced concrete casing *50*-feet in length filled with concrete after driving. The piles were to meet a certain bearing capacity, and the specifications provided that if the required bearing capacity was not obtained with the lengths of piling specified, the Officer-in-Charge could direct that longer length piles be used. An equitable adjustment in price and/or time was contemplated for any such changes.

On June 14, 1957 the first load of concrete piles was delivered to the work site on the east side of the dry dock. Between then and July 1, 1957 progress on the pile-driving work was impeded by obstructions, and by the failure of the first six 50-foot piles to achieve the required bearing capacity. Obstructions had been encountered which caused the piles to shear off line, and in some instances, to crack or break. Subsequently, the Navy directed plaintiffs to stop work on the concrete pile driving since the piles were not obtaining the required bearing capacity. Tests were thereafter made of the ground conditions on the east side of the dry dock, and it was determined that longer piles were needed. There was no pattern associated with the bearing capacity of the piles along the east side and, therefore, it was necessary in the period from July, 1957–October, 1957, to establish bearing capacity almost on a pile-by-pile basis. (See finding 17.) During this period, therefore, plaintiffs were unable to drive piles at its normal rate of operation (14–16 piles in a 8-hour

shift), and in fact, in August alone, plaintiffs were only allowed to drive four test piles. It was not until October 7, 1957 that plaintiffs finished driving all the piles along the line on the east side of the dock structure.

No satisfactory explanation could be offered for the unusual subsurface conditions which produced the great variations in the bearing capacity of the piles along the east side of the dry dock. A possible reason therefor was the difference brought about by a change in the water-table level caused by the earlier subsidence. Our trial commissioner has found, and we agree, that considering the subsidence that had taken place in the area, it would seem that reasonable prudence would have required the consulting engineers' firm that prepared the specifications and drawings for the Navy to have made prior tests of the subsurface conditions.

As a result of various directives issued by the Navy covering tests, engineering services and the driving of 112 longer piles during the period in question, three change orders were issued to compensate plaintiffs for the additional work entailed thereby. (See finding 23.) Thereafter, plaintiffs asked for delay damages, which claim was denied.

■ It is clear from the record that plaintiffs were delayed in the construction of the east dock structure by reason of the directives issued by the Navy in connection with the driving of piles in that area. No work could be done by plaintiffs above the ground level on the east dock structure until the piles were driven. However, the trial commissioner found that examination of plaintiffs' job record and the Government inspector's reports do not indicate that plaintiffs were damaged in any way, or suffered increased costs because of the delays in driving piles in the east dock area. (See finding 27(b).) The commissioner further found (finding 27(c)) that based on the job record, inspector's reports, and testimony (1) the overall performance of work under the contract was not delayed or disrupted as a result of the pile driv-

ing problems, (2) plaintiffs' men and equipment were fully utilized during the July–October 1957 period performing construction work that had to be done on other parts of the job, and (3) plaintiffs' utilization of their men and equipment during the July–October period was similar to such utilization subsequent to that period.

■ Under our Rule 66, the findings of the commissioner are presumptively correct. "To overcome this presumption, plaintiff must make a strong affirmative showing to the contrary." (Dodge Street Building Corporation v. United States, 341 F.2d 641, 644, 169 Ct.Cl. 496, 501 (1965). See also Commerce International Company, Inc. v. United States, 338 F.2d 81, 86, 167 Ct.Cl. 529, 537 (1964). Upon examination of plaintiffs' exceptions to the commissioner's findings, it is evident that plaintiffs have come nowhere near making the strong affirmative showing needed to upset these findings. Accordingly, the court adopts them, and as a matter of law, finds that plaintiffs are not entitled to recover on the second cause of action.

*First Cause of Action*

By October 14, 1958 plaintiffs had completed the driving of piles under the west side dock structure except for a cluster of four piles at the south end. They then commenced working on forms for the structure. In the meantime, the Navy Department had become concerned over whether or not the dry dock being constructed would be wide enough to accommodate the new nuclear carrier "Enterprise." An analysis of construction plans showed that it would not be possible to get the "Enterprise" into the new dry dock because sponsons thereon (projections from the hull) would protrude outward and conflict with the parapet walls of the dock. Plaintiffs were, therefore, instructed on October 17, 1958 to stop work on the walls and dock on a portion of the west side of the dry dock.

During the work hiatus on this portion of the west side, the Navy was having the drawings and specifications for the west

side changed. The changes were to include a deletion of part of the parapet wall, and in lieu thereof, the construction of a curb and removable rail section, and the relocation of utility service outlets, floodlights and mooring cleats. After the stop order was issued, plaintiffs were able to work on the sections of the west wall not covered by the stop order, although they had to alter their plans to do so.

A second stop order was issued on November 14, 1958. As a result of this order, plaintiffs were required to stop work on an additional section of the west side. Again, plaintiffs had to alter their construction plans, and this time additionally, had to lay off some carpenters and laborers. Plaintiffs were, however, able to continue a limited amount of work on the west side.

A third stop order was given to plaintiffs on November 18. From November 19 through November 26, 1958, plaintiffs were, therefore, precluded by the combined stop orders from doing any work on the west dock structure. However, they were constructively engaged during this six-day period in performing work under the contract outside the stop order area. For example, they were engaged during this period in constructing a retaining wall west of the dock structure, and in working on Pier 1 and elsewhere.

The new and reworked drawings and specifications were partially completed on November 26. These revisions were given to plaintiffs on that date, and work was thereafter partially re-commenced on the west dock structure. Defendant then greatly expedited delivery of the remaining plans and drawings. By December 17, 1958 plaintiffs had all the revised plans and drawings necessary to complete construction of the west side dock structure. Also, on that date the stop orders were no longer in effect.

In view of the additional work involved in making the required changes, a change order was issued by the Navy on June 15, 1959, increasing the contract price by $122,579, and extending the time for completion of the contract by 62 days. In the meantime, plaintiffs on March 17, 1959 submitted a delay damages claim in the amount of $61,094 on behalf of themselves and three of their subcontractors. The contracting officer disallowed the claim on the ground that it was a claim for damages, and as such, not a proper subject of compensation under the contract. Plaintiffs then appealed to the ASBCA which dismissed the appeal for lack of jurisdiction inasmuch as the claim was one of breach of contract. This is the claim that is before this court on the first cause of action.

Again in this cause of action, as in the one prior discussed, the trial commissioner's findings preclude recovery by plaintiffs. Upon examination of the record and plaintiffs' exceptions to the findings, we conclude these findings are correct. Accordingly, the court adopts them.

These findings (51–58) as adopted by the court, state in summary form:

(a) Plaintiffs were continually engaged in performing work on the contract here in issue throughout the claimed delay period (October–December 1958) despite the stop orders.

(b) Plaintiffs' men and equipment were not idled during the claimed delay as they were at all times able to perform other work on the contract.

(c) Plaintiffs presented no testimony to show costs for disruption of work.

(d) Plaintiffs had no difficulty either in laying off or rehiring employees.

(e) The issuance of the stop orders did not, therefore, unduly delay plaintiffs' performance.

Plaintiffs are not, therefore, entitled to recover on the first cause of action. The petition is dismissed on both causes of action.