**PITTMAN CONSTRUCTION COMPANY, INC.**

v.

**The UNITED STATES.**

**No. 538–81C.**

United States Claims Court.

March 31, 1983.

James J. Tansey, Washington, D.C., for plaintiff. Walstad, Kasimer, Tansey & Ittig, Washington, D.C., of counsel.

Colvin W. Grannum, Washington, D.C., with whom was Asst. Atty. Gen. J. Paul McGrath, Washington, D.C., for defendant.

## ON CROSS–MOTIONS FOR SUMMARY JUDGMENT

### OPINION

WIESE, Judge.

In proceedings before the General Services Administration Board of Contract Appeals (the board), plaintiff, Pittman Construction Company, a Government prime

contractor, had sought equitable adjustments on behalf of its electrical and plumbing subcontractors (respectively, Fischbach & Moore, Inc. and Babst Services, Inc.) for delays and disruptions suffered, ostensibly at the Government's hands, in the construction of the Federal Office Building, Courthouse and Parking Facility in New Orleans, Louisiana. Specifically, relief was sought under both the Changes clause and the Suspension of Work clause for: (i) uncompensated impact costs incurred as the result of 206 contract changes; (ii) delay costs associated with correction of errors and omissions in the contract drawings; and (iii) costs associated with Government delay in the approval of shop drawings submitted by Pittman. From the board's denial of relief,[1] this appeal followed. The contractor urges that the decision is not entitled to finality under the Wunderlich Act, 41 U.S.C. §§ 321–322 (1976), in that its factual determinations are claimed to be without substantial evidentiary support and its legal conclusions erroneous. Upon evaluation of the board's decision in light of the record, the parties' cross-motions for summary judgment and the oral arguments of counsel, it is concluded that no ground for reversal or modification has been demonstrated. The decision is, therefore, affirmed.

### Background

On November 13, 1972, the United States, acting through the General Services Administration, awarded plaintiff a fixed-price contract in the amount of $25,584,000 for the construction of a Federal Office Building, Courthouse and Parking Facility in New Orleans, Louisiana. Plaintiff, in turn, subcontracted portions of the work to others, including the electrical work to Fischbach & Moore, Inc. ("F & M") and the plumbing work to Babst Services, Inc. ("Babst"). The work began on December 4, 1972 and was timely completed (allowing for time extensions due to change orders and excusable delays) on April 5, 1976.

1. The decision on appeal is *Pittman Construction Co.,* 81–1 B.C.A. (CCH) ¶ 14,847, *aff'd on*

Following the completion of performance, the instant claims for equitable adjustment were presented to, and rejected by, the contracting officer. The matter was then taken to the board and there the two appeals—one in behalf of F & M, the other in behalf of Babst—were consolidated for purposes of trial and decision.

Trial of the issues consumed 38 days and the decision that followed on December 24, 1980, was equally comprehensive in scope (the record copy of the board's opinion is 47 pages in length and 31 pages as reproduced in the reports of the Board of Contract Appeals Decisions). Reconsideration was sought and a second opinion, affirming the first in reasoning and result, was issued by the board on May 7, 1981. The appeal to the court followed some months later.

### The Contractor's Claims

A. *The Direct Impact Claim:* In the course of contract performance, 206 contract change orders had been issued by the Government. Of that number, 152 represented added work and of these 152 there were 11 change orders in excess of $50,000. Only two of the change orders, however, were entirely electrical in their work content and none was entirely mechanical. Five of the change orders resulted in time extensions totaling 102 days.

As to these changes, the contractor contended before the board that they had been excessive in number, had occasioned delay and disruption to the unchanged work and had caused the performance of that work to be more costly than anticipated. For these change-related cost increases to unchanged work—described in this appeal as "direct impact" costs or "impact" costs—an equitable adjustment was sought.

The board denied the requested relief for reasons we come to shortly. For the moment we sketch those particular facts upon which the board had chiefly relied and upon which, in turn, the claim's present appeal is focused.

*reconsideration,* 81–1 B.C.A. (CCH) ¶ 15,111.

The evidence shows that in the pricing of the initial changes affecting F & M's work, the contractor had attempted to distinguish between costs for immediate payment (it identified these as "the usual cost elements such as labor, material and normal mark-ups") and expenses of more remote attendance (naming specifically, "additional changes in the sequence of work, delays, disruptions, rescheduling, extended overhead, overtime acceleration and/or impact costs * * *.") As to these last mentioned, the contractor's pricing proposal contained an express reservation "to make claim for any or all of these related items of costs prior to the settlement of this contract."

The contracting officer found this proposed two-stage pricing approach unacceptable. Referring to it as an "open-end" arrangement on contract changes, it was his view (so expressed in a letter to the contractor of July 25, 1973) that the modification requests could—and should—be priced in their entirety and preferably from the outset. He offered two alternatives. One was to have the work go forward at the price of the Government's unilateral estimate leaving the final price determination to a board proceeding; the other was to have the contractor reprice the requested work to allow for the possibilities itemized in the reservation. This second alternative, it was explained, would most likely result in the issuance of a change order on a "price-to-be-determined-later" basis with the pricing to be accomplished either by agreement or else unilaterally at the point when the project was 50 percent complete. Any disagreement on price at this juncture, would, of course, be appealable.

Confronted with these choices, the contractor elected instead to go forward with the work at the price it had originally quoted while, at the same time, relinquishing its attempted reservation of unpriced costs. On this last point, the contractor wrote on July 30, 1973, saying, "we will not apply our statement [of cost reservation] to these par-ticular items [referring to the several pending modification requests]." It went on to add—this in response to the contracting officer's letter disapproving of the attempted reservation of costs: "We will advise further on your 25 July letter at a future date."

Nearly a full year later (June 4, 1974), the contractor transmitted to the Government the first of several letters that had as their common theme concern over performance delays and disruptions attributable (so the letters claimed) to the extensive number of changes in the work. The letter stressed that the costs being incurred because of these interruptions were not then fully determinable; hence, cost consideration would have to be taken up upon the conclusion of performance.[2] There were four letters of this same import written (all between June 4, 1974 and February 14, 1975) and together they served as the bases for the contractor's argument before the board (and again here) that the Government had been put on notice that impact costs had not been covered in the forward pricing of the change orders and therefore survived as a separate claim for which the contractor was now due further compensation.

The board, as we have said, rejected this claim. The decision rested on two grounds. The first, and narrower ground, was entirely a factual one: that the Government had been prepared to negotiate direct impact costs with plaintiff and its subcontractors and, indeed, had done so. Proof of this point was those several instances in which the change-order pricing had focused on an allowance of extra labor hours because the changes involved were seen to require out-of-sequence work. On this same issue, there was competing testimony denying that such impact costs had been covered but to this testimony the board gave little heed; that evidence suffered, the board said, from "a failure to distinguish between the two kinds of im-

2. We do not quote the letters in this opinion. The relevant sections of those letters occur in the board's decision, 81–1 B.C.A. at 73,292–93.

pact costs [*i.e.*, direct and indirect]", *Pittman Construction Co.*, 81–1 B.C.A. (CCH) ¶ 14,847 at 73,299, and much of it the board also thought was "implausible". *Id.* at 73,299. There is nothing said in the present appeal sufficient to detract from the board's decision on this point or indeed even to warrant its re-examination. We leave the matter rest.

 The second and more encompassing basis for the board's decision was its conclusion that the contractor's withdrawal of its initially-declared reservation of rights (the letter of July 30, 1973, quoted, in part, *supra*) amounted to an acquiescence in the contracting officer's position insisting that all change costs (including direct impact costs) be included in the change orders as they were priced. And that acquiescence, the board further held, had not been affected by the contractor's four subsequent letters proclaiming a disability in its attempted pricing of delay costs. The board took those letters as sufficient only to preserve a claim for "indirect" impact costs (a matter of later discussion in this opinion); it judged them inadequate to overcome or undo the manifestation of assent to the Government's pricing concepts exhibited in the contractor's earlier conduct.

As to this last point, the board put its thoughts this way:

* * * We have in the present case not one but four letters complaining somewhat inarticulately about the impact of a multiplicity of change orders on the contract work. We have great difficulty in treating these letters as notice to the Government that the contractor was rescinding its acquiescence in the contracting officer's position on the total forward pricing of the change orders with all costs included: (1) appellant was not writing on a *tabula rasa* when it wrote these letters; (2) appellant had not only received a letter inviting it to suggest a different method but had responded initially by saying it would "advise further * * * at a later date;" (3) appellant never again made express mention of either the Government's July 25 letter or its July 31 response; (4) instead appellant submitted generalized complaints at infrequent intervals beginning almost a year after the initial correspondence. [81–1 B.C.A. at 73,300.]

The sum and substance of the board's observations were that, when viewed against the background of the parties' initial dialogue on change-order pricing, the contractor's letters were much too remote, in time and in content, to stand as notice to the Government that that pricing had not taken all expected direct costs into account.

The argument now being pressed ignores all of the factual problems which the board had given as its reasons for finding the contractor's letters insufficient to preserve a claim for direct impact costs. Instead, the argument seems to go forward on the premise that the reservation of a claim for such costs was accomplished here simply by the contractor's unilateral pronouncement of such a purpose—a sort of notice at large that affected the change-order pricings even though never asserted in the course of the negotiations determining those pricings.

The position has no merit. For one thing, it makes no sense at all to contend, as part of this argument impliedly does, that the letters were sufficient to preserve a claim for direct impact costs even as to change orders whose pricing had been resolved (*i.e.*, agreed to) prior to the letters' issuance. Questions pertaining to the scope of costs addressed in the pricing of a change order turn—as do all questions of contract meaning—on the mutual intention of the parties as expressed through their objective manifestations of assent. It would scarcely need saying, therefore, that declarations of position (meaning the contractor's letters) that are first announced long after agreements have been finalized can have nothing to do with the intentions embodied in such agreements. In plain terms, the letters were irrelevant, factually and legally, to the change orders priced before them.

At the oral argument of the case, the point was made that even if the letters were of no consequence so far as the pricing of the preceding change orders was con-

cerned, they were at least sufficient to have informed the contracting officer that direct impact costs were being reserved on all subsequent change-order pricing.

Again the argument does not succeed. The letters did not speak of direct impact costs (as well they should have had that been their object). Rather, their common drift was the multiplicity of changes on the job and the fact that, because of this, there were costs being incurred (not then calculable, the letters said) which the direct pricing of the change orders had not considered.

And that was the sense that the contracting officer took from them too. He read the letters to say that, even in the face of a full, forward pricing requirement on change orders (a requirement which, we should add, he viewed as having been adhered to here) there yet remained costs which that pricing had not been able to take into account. Significantly, however, the contracting officer did not regard such costs as redressable under the Changes clause. Rather, in his view, the change orders, having once been priced in full, any cost claim that might survive that effort could be recognized, if at all, only through judicial pronouncement (*i.e.,* board action) but not under the Changes clause.

What all of this comes down to is that the contracting officer neither saw nor understood the contractor's letters as signaling any departure from the change-order pricing scheme established in the beginning; the contractor's letters did no more than give notice of a possible claim for costs *distinct* from those that had been considered. The argument offered now gives us little reason—none in fact—for saying that the contracting officer, and the board after him, should have read the letters otherwise. In short, the reservation of a claim for direct impact costs was never accomplished for no such reservation was ever communicated much less agreed to.

B. *The Cumulative Impact Claim:* As noted in the preceding discussion, even

though the board has found the contractor's letters of no legal significance so far as the reservation of a direct impact cost claim was concerned, it did deem them sufficient to secure a claim for indirect or "cumulative" impact costs. Such costs, as the board defined them, addressed the inefficiencies and disruptions associated with changes which, when viewed cumulatively (*i.e.,* retrospectively), were so large in number and/or magnitude as to give rise to a separately compensable impact claim. The term "ripple effect" has also been used to describe such impact costs.

A right to assert a claim for costs of this nature was seen to have survived here for the way the board reasoned it, the contractor's disability to recognize such costs (except at contract end), coupled with the contracting officer's disavowal of authority to ever permit them, were jointly sufficient reasons for saying that neither side had intended to address such costs in the forward pricing of the change orders.

But even as the board was willing to endorse such costs conceptually and to recognize their survival (as a provable claim) on the facts of the case, so it went on to find that the contractor had failed to prove entitlement to them. Two grounds were given for this result. First, that in terms of their number and dollar value, the changes that were involved here (even when taken in the aggregate as opposed to counting only those affecting F & M's and Babst's work) were not enough to support the claimed costs. There had been 206 changes in this case which enlarged the contract's dollar value by roughly 12 percent (they added $3,000,000 to a $25.6 million contract) and extended its performance period by approximately 10 percent (102 days were added to an original performance schedule of 1,000 days). These numbers, contrasted with the change dimensions noted in other cases in which cumulative impact claims had been considered,[3] led the board to con-

---

3. In its opinion, the board compared *Ingalls Shipbuilding Division, Litton Systems, Inc.,* 78–1 B.C.A. (CCH) ¶ 13,038.45, with *Dyson &* *Company,* 78–2 B.C.A. (CCH) ¶ 13,482, *aff'd on reconsideration,* 79–1 B.C.A. (CCH) ¶ 13,661. In *Ingalls,* where cumulative impact costs were

clude that no fundamental change in the character of the work had taken place and thus no costs had been experienced whose likelihood had not been foreseeable.

The second, but no less important ground for the board's rejection of cumulative impact costs, was the fact that the contractor's evidence failed to take account of those delays and disruptions in the work that were traceable to the prime contractor's own deviations in the planned construction sequence. Mentioned in this regard were difficulties which plaintiff had experienced in laying the foundation that occasioned delays and, in turn, forced a change in the timing of the erection of the structural steel. These departures (the basement slab was seven months late in completion; the structural steel work was accomplished in pyramid fashion rather than floor-by-floor as planned) were found by the board to have had "an effect on the sequence of performance of the subcontractors' work, and they amounted to concurrent delays for which Pittman is responsible." 81–1 B.C.A. at 73,289.

The arguments that the contractor makes against the board's decision are not enough to warrant any change in result. The argument consists, first of all, of a reiteration of the testimony offered before the board—all of it to the general effect that the Government-ordered changes had been excessive in number, an impediment to orderly performance and the source of much ineffeciency to the subcontractors' work forces. Along with this testimony (whose disregard the contractor sees as arbitrary and capricious) the point is also made that the real basis for the board's decision was not that it thought the contractor's proof of claim inadequate but, rather, that it saw the costs being claimed as not allowable as a matter of law.

Whether the board was right or wrong in the definition and standards by which it

would measure the allowability of a cumulative impact claim is irrelevant to the case as it stands here. There were, as we have said, two grounds for the board's decision and the second of these—a finding of concurrent delay—is left entirely unchallenged in the contractor's argument. The point could not have been misunderstood or overlooked for, in its decision on reconsideration, the board specifically reaffirmed this ground of the initial opinion saying "that they [the delays attributable to the prime contractor] were far more plausible contributors to the delays and disruptions suffered by appellant than were the instances of Government fault." 81–1 B.C.A. at 74,754.

None of the testimony that has been cited here offers any basis for rejecting the board's finding that there were concurrent delays. That ends the matter. Settled law dictates that where both parties contributed to the delay "neither can recover damage, unless there is in the proof a clear apportionment of the delay and the expense attributable to each party." *Coath & Goss, Inc. v. United States,* 101 Ct.Cl. 702, 715 (1944); *Commerce International Co. v. United States,* 167 Ct.Cl. 529, 543, 338 F.2d 81, 90 (1964).

C. *The Errors and Omissions Claim.* A third claim that the board considered and denied was plaintiff's claim of subcontractor disruption and delay due to errors and omissions in the contract drawings.

That there were such errors and omissions the Government conceded; the board went on to decide however, that it was "unable to find that such errors and omissions as did occur were at all out of the ordinary", 81–1 B.C.A. at 73,302, and also that there was "a singular lack of proof on appellant's part that it or its subcontractors incurred any uncompensated costs as a re-

allowed, three shipbuilding contracts had been affected by several thousand change orders that occasioned a 58 percent contract price increase (from $113 to $209 million) and spawned a 4-year delay in the first incremental delivery. *Dyson,* by contrast, denied cumulative impact costs on the claim presented in

behalf of a mechanical subcontractor whose work had been exposed to 39 change orders that had increased subcontract performance costs by roughly 19 percent ($612,454 was added to $3.3 million) and had added 100 days of time extension.

sult of any errors or omissions." *Id.* at 73,302.

The support for these conclusions was drawn from the board's item-by-item examination of the claimed errors and omissions and the several specific determinations of fact established through that examination. Specifically, with regard to the extent of the claimed errors and omissions, the board found:

(i) that the allegedly excessive number of errors claimed (roughly 200) was explained, in part, by instances of multiple counting of a single error;

(ii) that certain of the errors claimed were not errors at all; and

(iii) that part of the subcontractor's difficulty in its reading of the drawings was due to a failure to understand conventional architectural descriptions and symbols.

As to its conclusion regarding lack of proof of uncompensated costs, the board noted that in most of the instances where the evidence had established an error or omission in contract drawings, it also showed that the discrepancy had been resolved through change orders mutually agreed to by the parties. But, beyond these specific instances of error and correction, the board was unable to find in the testimony "any statement that any particular error or omission in fact had any disruptive effect on F & M's work." 81–1 B.C.A. at 73,308.

We are now asked to overturn the board's decision but what is offered for that purpose is nothing more than selected restatements of the very same testimony that the board had found inadequate in the first place. That testimony provides no basis for reversing the board's decision; indeed, it succeeds only in confirming it.[4]

■ D. *The Shop Drawings Claim:* The fourth and last of the claims we consider here was the board's rejection of a claim for delay and disruption allegedly caused by tardiness on the Government's part in its approval of shop drawings.

The board divided the analysis of this claim into two parts: (i) delays in the approval of F & M's and Babst's own shop drawings; and (ii) delays in the approval of other shop drawings and their impact upon F & M's and Babst's work. As to the first part, the board found that, while approval delays had been experienced, the evidence was much less definite as to who was primarily responsible for those delays. From all the relevant evidence, the board concluded that the fault had been mutual. But that determination, the board then went on to say, was essentially beside the point for "[n]either F & M nor Babst ever put forth evidence that their work was delayed for lack of an approved mechanical or electrical shop drawing." 81–1 B.C.A. at 73,311. Thus lack of proof of injury was the basic ground upon which the claim for delay in the approval of mechanical and electrical shop drawings was rejected.

As to other shop drawing delays, there were two categories—millwork and hollow metal door frame drawings—that were found by the board to have impacted upon F & M's and Babst's work. But as to the responsibility for the delays associated with the final approval of these drawings, this the board acknowledged was a far less definite matter. The problem the board faced was that, while the record revealed extensive delays between initial submission by the contractor and final approval by the Government, it also revealed that many of those drawings had been rejected and twice resubmitted and, further, that unexplained delays often attended the resubmission of the drawings. In short, the record seemed to leave the question of delay responsibility very much up in the air.

Nevertheless, the board ultimately resolved the issue against the contractor by relying upon the testimony of F & M's project manager attributing the delays in the approval of the drawings to the mill-

---

4. In connection with this same claim, plaintiff's brief also contains an argument to the effect that the board committed legal error in concluding that claims for errors and omissions

were barred by concurrent delays. The argument does not fit; failure of proof and not concurrent delay was the reason for the board's rejection of the errors and omissions claim.

work subcontractor. In this same connection, the board also noted that F & M's equitable adjustment claim to the contracting officer had made no allegations at all concerning shop drawing approval delays.

The board went on to say that, even if responsibility for the delay in the millwork shop drawings were to be placed on the Government's shoulders, little more than minimal impact would thereby be acknowledged. The millwork drawings, the findings explained, impacted the "finishing work", that is, items that went on to the exterior of the affected walls. Hence, the work that would be involved, though now to be accomplished on a delayed schedule, could nevertheless progress at that later time with a minimum of interruption.

As to the delays respecting the hollow metal door drawings, the board said that its findings and conclusions were the same as those for the millwork drawings, *i.e.,* that there were approval delays and that, as between Pittman and the Government, it was Pittman to whom the responsibility for those delays was assignable.

The attack that plaintiff now makes upon the board's disposition of the claim does not contest that part of the decision denying relief for delays in approval of the electrical and mechanical shop drawings. That point, therefore, requires no further discussion here.

As to the board's decision regarding the approval delays in the millwork and door frame drawings, the appeal asserts that the decision is not supported by substantial evidence in that (i) both the contracting officer and GSA's own correspondence acknowledged delays on the part of the architect (hence, the Government) in the approval of shop drawings, and (ii) those delays adversely affected F & M (and Babst as well) beyond the minimal impact the board had found.

The problem with this argument is that it does not meet the crux of the board's decision. To start with, it is factually incorrect to say that the board had ignored or overlooked testimony of Government delay. On the contrary, those same acknowledgements of delay on the part of the contracting officer to which plaintiff now points in its brief had also been considered by the board in reaching its decision. There can be no doubt on this score for the opinion on reconsideration says so unequivocally: "We did consider the contracting officer's testimony, but we felt it outweighed by the testimony of appellant's witness [F & M's project manager] that he considered the delays to those drawings to be the fault of another subcontractor, rather than of the Government." 81–1 B.C.A. at 74,755.

As the quoted material indicates, even though the contracting officer's testimony had been considered, still the board was persuaded to go the other way. And it did so for reasons which the present appeal fails to address: the delays borne of faulty drawings and tardy resubmissions which F & M, in the course of pricing its own claim, had assessed as the millwork subcontractor's responsibility.

What we are left with, therefore, is an appeal that cannot succeed. Undeniably, the extensive delay that occurred between initial submission and final approval of the drawings was not the Government's doing alone. There were intervening contributants and those were seen—at least in one side's view of the facts—as the real source of the delayed approval. The subcontractor, F & M, priced the claim that it would later present to the board on the premise that, among the cost-contributing factors for which the Government was not to blame, were the delays in shop drawing approval. That the board chose to resolve the conflicting evidence before it by relying on F & M's own "concession" surely offers no basis for calling the decision wrong, factually or legally.

The result then is a decision denying relief for delays judged, on the basis of substantial evidence, to have been the prime contractor's responsibility. This disposition of the claim, being final in all respects, there is no need to consider the board's alternative view concerning minimal impact of the delays.

## CONCLUSION

For the reasons given herein, plaintiff's motion for summary judgment is denied, defendant's cross-motion is granted, and the petition is to be dismissed.